UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,               Crim. No.  19-CR-20107

v.                                 Hon. Thomas L. Ludington
                                 United States District Judge

RONALD ARTHUR POLK,

          Defendant.

_____

## UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

_____

As further detailed in the brief below, the United States asks this Court to deny Ronald Arthur Polk's motion for compassionate release. (ECF No. 81: Motion for Compassionate Release, PageID. 300).

The Bureau of Prisons ("BOP") has taken significant steps to protect all inmates, including Polk, from Covid-19. Since January 2020, the BOP has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). According to the BOP, as of August 20, 2020, there are zero active cases of Covid-19, and three recovered inmate and one recovered staff cases, with zero deaths, at Butner Medium II FCI, where Polk is housed. *See* https://www.bop.gov/coronavirus/. And the BOP has assessed its

entire population to determine which inmates face the most risk from Covid-19,

pose the least danger to public safety, and can safely be granted home confinement.

As of August 20, 2020, this process has already resulted in at least 7,578 inmates

being placed on home confinement. *See* BOP Covid-19 Website. At least 120 of

those inmates are from the Eastern District of Michigan. Especially given the

BOP's efforts, this particular inmate's circumstances, and "the legitimate concerns

about public safety" from releasing inmates who might "return to their criminal

activities," *Wilson*, 961 F.3d at 845, this Court should deny Polk's motion for

compassionate release.

 Polk has not filed a request for release with the BOP after he was transferred

into the BOP's custody to serve his sentence on August 5, 2020. However, on May

26, 2020, Polk's previous attorney sent a letter to the Clare County Jail, where Polk

was housed at the time, requesting compassionate release due to debilitated

medical condition and Covid-19 pandemic. *See* Exhibit A- Letter to Clare County

Jail from Attorney John Melton. While still in Clare County Jail, on June 25, 2020,

Polk filed the instant *pro se* motion for compassionate release, docketed on July 5,

2020. (ECF No. 81, PageID. 300). He alleges that his attorney sent a letter similar

to the one addressed to the Claire County Jail to the BOP. *Id*. However, at that

time, because Polk was not in the BOP's custody, he had no administrative

remedies with the BOP. Because at the time he filed his *pro se* motion for

compassionate release Polk did not have any administrative remedies available to him, the United States will treat Polk's motion as having exhausted his available remedies.

Polk however does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). In his motion, Polk simply claims he qualifies for release because he suffers from a "debilitated medical condition," but fails to state what the condition is and how he meets all of the requirements for compassionate release. In a letter to Clare County Jail, where Polk was housed at the time of the motion, dated May 26, 2020, Polk's former attorney stated that Polk suffers from multifocal recurrent intermediate grade dedifferential liposarcoma of the retroperitoneoum, a rare cancer of the connective tissue, which is an incurable disease, but which is currently stable in Polk's situation, with the potential to progress at some point in the future. *See* Exhibit A. Polk is 61 years old. Polk's BOP current medical records[1] show the following as current medical conditions: benign lipomatous neoplasm/liposarcoma, benign neoplasm of prostate, type 2 diabetes mellitus, essential (primary) hypertension, disease of pancreas, presence of cardiac

---

[1] Polk's BOP detailed medical records are available upon this Court's request.

pacemaker. According to the BOP records, Polk is in stable chronic care. Although Polk's heightened risk from Covid-19 based on his liposarcoma and diabetes may qualify, in the context of the Covid-19 pandemic, as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Polk is not otherwise eligible for release. The United States notes that according to Polk's University of Michigan doctor, Polk's liposarcoma is stable, and the course of action recommended at this time is observation. *See* Exhibit B- Medical Report previously filed by defense on December 17, 2019, as ECF No. 61-1, PageID. 225. While the disease has no cure and could become life-threatening, many patients live with the disease for years. *Id*. Polk is receiving proper medical care and treatment in prison for all his medical conditions. Polk is not disabled or unable to perform activities of daily living. There is no allegation that Polk's medical conditions substantially diminish his ability to provide self-care within the environment of the correctional facility. *See* USSG § 1B1.13 cmt. n.1.

Polk's underlying offense conduct and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)— likewise do not support release. Polk was found guilty by a jury of possession of and accessing with intent to view over 3,000 images containing child pornography involving children under the age of 12 or prepubescent children. Many of the

4

images were of children under the age of 10. Some of the images depicted penetration of infants and toddlers, some images depicted bondage of children, and many images related to incest. Polk sexually abused his daughter, to include through oral and vaginal sex, for approximately five years, when she was between the ages of 8 and 12 years old. He also forced her to watch child pornography to induce and coerce her to engage in sex with him. Two criminal investigations into the criminal sexual conduct involving his daughter had been initiated and then closed due to the victim being afraid to disclose the abuse. Despite these previous attempts to bring him to justice, Polk continued his appalling conduct unabated until the victim was removed from his home and custody. Polk has a long criminal history that includes: assault with intent to do great bodily harm less than murder; assault with dangerous weapon; animal cruelty; animals at large; two convictions for false pretenses more than $200, but less than $1,000; conducting criminal enterprises; false pretenses more than $1,000, but less than $20,000; establishing unauthorized disposal site for and disposal of solid waste; improper disposal of solid waste; fraudulent use of public utility; and several convictions for reckless driving, impaired driving, driving with license suspended, speed violations and other motor vehicle violations. *See* PSR. He also violated probation on several occasions. *See* PSR ¶¶ 66-68. He has demonstrated a constant disregard for the law and court orders by engaging in the same type of criminal behavior over and over.

And he has already had several disciplinary violations while incarcerated at Clare County Jail and the BOP. His release would endanger the community.

## BRIEF

### Background

On September 16, 2019, Polk was found guilty by a jury of possession of and accessing with intent to view child pornography involving children under the age of 12 or prepubescent children between on or about August 6, 2013 and August 23, 2018, in violation of 18 U.S.C §2252A(a)(5)(B) and §2252A(b)(2). (ECF No. 58: Jury Verdict). Many of the over 3,000 images he possessed were of children under the age of 10. *See* PSR. Some of the images depicted penetration of infants and toddlers, some images depicted bondage of children, and many images related to incest. *Id*., ¶ 26-28. Two of Polk's daughters testified at his trial. The adult daughter reported him to the police when she saw him watching child pornography out in the open in the living room. *Id*., ¶ 8-9. The minor daughter endured several years of calvary at the hands of Polk. Polk sexually abused his minor daughter, to include through oral and vaginal sex, for approximately five years, when she was between the ages of 8 and 12 years old. *Id*., ¶¶ 15-23. He also forced her to watch child pornography to induce and coerce her to engage in sex with him. *Id*. Two criminal investigations into the criminal sexual conduct involving his daughter had been initiated and then closed due to the victim being

afraid to disclose the abuse. *Id*. Despite these previous attempts to bring him to justice, Polk continued his appalling conduct unabated until the victim was removed from his home and custody. *Id*. His family shunned him. *See* PSR.

On December 20, 2019, Polk was sentenced to 240 months in prison followed by five years of supervised release. (ECF No. 64: Judgment). The issue of restitution to his minor daughter remained open, and an amended judgment was entered ordering no restitution to Polk's minor daughter on April 24, 2020. (ECF No. 74: Amended Judgment). Polk appealed and his appeal remains pending. (ECF No. 75: Notice of Appeal). Polk's criminal history includes assault with intent to do great bodily harm less than murder; assault with dangerous weapon; animal cruelty; animals at large; two convictions for false pretenses more than $200, but less than $1,000; conducting criminal enterprises; false pretenses more than $1,000, but less than $20,000; establishing unauthorized disposal site for and disposal of solid waste; improper disposal of solid waste; fraudulent use of public utility; and several convictions for reckless driving, impaired driving, driving with license suspended, speed violations and other motor vehicle violations. *See* PSR. He has also violated probation on several occasions. *See* PSR ¶¶ 66-68.

Polk began serving his prison sentence on December 20, 2019, in Clare County Jail and was transferred to Butner Medium II FCI on August 5, 2020. He is 61 years old, and his projected release date is March 20, 2036. He has already had

a few disciplinary violations: for indecent exposure and refusing to obey an order at Butner Medium II FCI, and tempering with e-cigarettes and misusing his prescribed medication by sharing it with other inmates at Clare County Jail.[2] According to his BOP records, Polk's underlying medical conditions are: benign lipomatous neoplasm/liposarcoma, benign neoplasm of prostate, type 2 diabetes mellitus, essential (primary) hypertension, disease of pancreas, presence of cardiac pacemaker. Polk is in stable chronic care.

Polk has not filed a request for release with the BOP after he was transferred into the BOP's custody to serve his sentence on August 5, 2020. However, on May 26, 2020, Polk's previous attorney sent a letter to the Clare County Jail, where Polk was housed at the time, requesting compassionate release due to debilitated medical condition and Covid-19 pandemic. *See* Exhibit A. On June 25, 2020, while still in Clare County Jail, after only serving approximately 7% of his imprisonment sentence, Polk filed the instant *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), docketed on July 5, 2020. (ECF No. 81: Motion for Compassionate Release, PageID. 300). He alleges that his previous attorney also sent a letter to the BOP. *Id*. However, at that time Polk was not in the BOP's custody, and, thus, he had no administrative remedies with the BOP. For this

---

[2] Polk's discipline records are available upon this Court's request.

reason, the United States will proceed as if Polk exhausted his administrative remedies, which were none. His motion should be denied.

## Argument

**I.    The BOP has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A.    The BOP's precautions have mitigated the risk from Covid-19 within its facilities.

The BOP has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020)*.* For over almost a decade, the BOP has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the BOP began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the BOP began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the BOP has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the BOP has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are

isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the BOP has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the BOP has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the BOP has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the BOP's measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

With specific reference to Butner Medium II FCI, extraordinary measures have been undertaken to combat the Covid-19 pandemic, the current state of

inmate testing and health, and other issues related to those topics. According to the

BOP, as of August 20, 2020, there are zero active cases of Covid-19, and three

recovered inmate and one recovered staff cases, with zero deaths, at Butner

Medium II FCI, where Polk is housed. *See* https://www.bop.gov/coronavirus/.

**B.     The BOP is increasing the number of inmates who are granted
        home confinement.**

The BOP has also responded to Covid-19 by increasing the placement of

federal prisoners in home confinement. Recent legislation now temporarily permits

the BOP to "lengthen the maximum amount of time for which [it] is authorized to

place a prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2),

Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General

has also issued two directives, ordering the BOP to use the "various statutory

authorities to grant home confinement for inmates seeking transfer in connection

with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the BOP to identify the

inmates most at risk from Covid-19 and "to consider the totality of circumstances

for each individual inmate" in deciding whether home confinement is appropriate.

(03-26-2020 Directive to BOP, at 1).

The BOP's efforts on this point are not hypothetical. Over 7,578 federal

inmates have been granted home confinement since the Covid-19 pandemic began,

and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the BOP is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The BOP, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public

generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The BOP must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the BOP's home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the BOP must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the

release plan, including whether the inmate will have access to health care and other resources. It must consider a myriad of other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the BOP to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the BOP."). It is especially true now, given the BOP's substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Polk's motion for compassionate release.

Polk's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory

exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Even when a defendant exhausts the BOP administrative process, he must still show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Moreover, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the

law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.    Polk is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release is improper in Polk's case. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the BOP has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The BOP has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Polk and other inmates. *See Wilson*, 2020 WL 3056217, at *2, *8. Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional

efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Polk's age—61 years old—does not satisfy the age requirements for release in USSG § 1B1.13 cmt. n.1. Polk's medical records, however, establish that he has liposarcoma—a form of cancer—and diabetes, which the CDC has confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with those medical conditions, Polk may have satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A). However, the United States would also note that Polk's liposarcoma is stable, and the course of action recommended at this time is observation. *See* Exhibit B. While the disease has no cure and could become life-threatening, many patients live with the disease for years. *Id*. Polk is receiving proper medical care and treatment in prison for all his medical conditions. Polk is not disabled or unable to perform activities of daily living. And there is no allegation that Polk's medical conditions substantially diminish his ability to provide self-care within the environment of the correctional facility. *See* USSG § 1B1.13 cmt. n.1. Polk is in stable chronic care.

Further, Polk's record casts significant doubt on whether he would abide by the release conditions and social-distancing protocols that could diminish his risk

of contracting Covid-19 if released from custody. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. It depends on a long list of variables, including the precautions at his prison, the number of Covid-19 cases there, the prison's medical facilities, his access to medical care if released, and the threat from Covid-19 at his release location. A defendant's risk of contracting Covid-19 also depends not just on his opportunities for social-distancing, but on his willingness to take advantage of those opportunities and engage in social-distancing for the pandemic's duration. As noted above, the FCI where Polk is housed has a total of zero active cases of Covid-19, and three recovered inmate and one recovered staff cases, with zero deaths. Midland County, where Polk would reside, has 385 Covid-19 cases with 10 deaths. https://www.michigan.gov/coronavirus/. As detailed above, given Polk's history and characteristics, Polk is unlikely to abide by release restrictions and is thus more likely than most people to expose himself and innocent people to Covid-19.

Polk also remains ineligible for compassionate release because he is a danger to the community if released. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders,

including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 &

n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at

*3 (E.D. Mich. June 9, 2020). *United States v. Oliver*, No. 2:17-cr-20489, 2020

WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2)

references for its dangerousness determination—requires a comprehensive view of

community safety, "a broader construction than the mere danger of physical

violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per

curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he

concept of a defendant's dangerousness encompasses more than merely the danger

of harm involving physical violence." *United States v. Williams*, No. 20-1413,

2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*,

851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly

post-judgment, when the defendant's presumption of innocence has been displaced

by a guilty plea or jury's verdict and when "the principle of finality" becomes

"essential to the operation of our criminal justice system." *Teague v. Lane*, 489

U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of

violent offenders. It bars the release of most drug dealers, "even without any

indication that the defendant has engaged in violence." *United States v. Stone*, 608

F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect. *See Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Israel*, No. 17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017) (recognizing that "economic harm may qualify as a danger" foreclosing release).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public

safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

As detailed above, Polk's underlying offense conduct involved child pornography, and his minor daughter. He sexually assaulted his daughter for years. He is a violent offender who was also convicted for assaulting with intent to do great bodily harm less than murder and for assaulting with dangerous weapon. His violent behavior at home has also been detailed by his children: he beat his children to the point of bloody nose, and used a knife and even a shotgun to assault them. *See* PSR ¶¶ 12-13, 16. He physically and mentally abused his family. *See* PSR. He is not only violent towards humans, but also animals, as implied by his conviction for animal cruelty after he was charged with 47 counts of animal cruelty. He also repeatedly engaged in fraud and criminal enterprise. He violated probation and court orders. Lengthy prison terms have not deterred him. He has already been disciplined during his current incarceration for several violations. His record clearly shows his release would endanger the community, and § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Polk is not eligible for compassionate release.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate

release. Before ordering relief, the Court must consider the factors set forth in 18

U.S.C. § 3553(a) and determine that release is appropriate. *See United States v.*

*Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The

§ 3553(a) factors . . . weigh against his request for compassionate release.");

*United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich.

May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant

compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*,

No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying

compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not

favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th

Cir. 2020) (upholding a district court's denial of compassionate release based on

the § 3553(a) factors). So even if the Court were to find Polk eligible for

compassionate release, the § 3553(a) factors should still disqualify him.

Polk accessed with intent to view and possessed thousands of images

containing child pornography that depicted children under the age of 12, toddlers

and infants engaged in sex, bondage, and incest. He sexually abused his daughter

for approximately five years and coerced her to watch child pornography, until she

was finally removed from his home and custody. He skillfully covered his tracks,

and dodged previous investigations into his criminal sexual conduct by silencing

the victim daughter through fear and guilt. He was finally brought to justice and

sentenced to 240 months in prison for his child pornography-related conduct. Polk's 240 months' imprisonment sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Polk only served approximately 7% of his sentence.

At age 61, Polk has a lengthy, serious criminal history covering a broad range of crimes: assault with intent to do great bodily harm less than murder; assault with dangerous weapon; animal cruelty; animals at large; two convictions for false pretenses more than $200, but less than $1,000; conducting criminal enterprises; false pretenses more than $1,000, but less than $20,000; establishing unauthorized disposal site for and disposal of solid waste; improper disposal of solid waste; fraudulent use of public utility; and several convictions for reckless driving, impaired driving, driving with license suspended, speed violations and other motor vehicle violations. *See* PSR. He is violent towards children, family, strangers and animals. He has become a skillful fraudster. He also violated probation on several occasions. *See* PSR ¶¶ 66-68. He has demonstrated a constant disregard for the law and court orders by engaging in the same type of criminal behavior over and over. And he has already had several disciplinary violations while incarcerated at Clare County Jail and the BOP. Polk's 240 months' imprisonment sentence affords adequate deterrence and protects the public from further crimes of this defendant.

**III.    If the Court were to grant Polk's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Polk's motion despite the government's

arguments above, the Court should order that he be subjected to a 14-day

quarantine before release.

### Conclusion

Polk's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: August 25, 2020              s/Anca I. Pop
                                    Assistant U.S. Attorney
                                    101 First Street, Suite 200
                                    Bay City, MI  48708-5747
                                    Telephone Number: (989) 895-5712
                                    E-mail:  anca.pop@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that on August 25, 2020, the foregoing document was
electronically filed, by an employee of the United States Attorney's Office, with
the Clerk of the Court using the ECF system, and I hereby certify that an employee
of the United States Attorney's Office mailed by United States Postal Service the
document to the following non-ECF participant: Ronald Polk, Id No. 57302-039,
FCI Butner Medium II, Federal Correctional Institution, P.O. Box 1500, Butner,
NC 27509.

s/Anca I. Pop
Assistant U.S. Attorney